UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> J. PATRICK O'NEILL and ROBERT H. BRAY, ) <br> ) <br> Defendants. ) <br> ) | Civil Action No. _____ <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against defendants J. Patrick O'Neill ("O'Neill") and Robert H. Bray ("Bray").

## SUMMARY

1. This case involves insider trading by O'Neill and Bray in the securities of Wainwright Bank & Trust Company ("Wainwright"), a publicly-traded Massachusetts-based bank, in advance of the June 29, 2010 public announcement that Eastern Bank Corporation ("Eastern Bank") had agreed to purchase Wainwright.

2. In May and June 2010, O'Neill, then a Senior Vice-President and a Senior Credit Officer at Eastern Bank, conducted a due diligence review of Wainwright's loan portfolios for use in deciding whether Eastern should acquire Wainwright. O'Neill then conveyed material nonpublic information about Wainwright to his friend and fellow country club member Bray.

3. Based on this material nonpublic information, Bray purchased 31,000 shares of Wainwright over a two-week period beginning June 14, 2010 at a cost of more than $288,000. After the June 29 announcement, Wainwright's stock price jumped more than $9 per share (an

increase of approximately 94%) and Bray reaped profits totaling almost $300,000 following the public announcement of the acquisition.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

4. The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)]. The Commission seeks permanent injunctions against the defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; disgorgement of ill-gotten gains from the unlawful insider trading activity set forth in this Complaint, together with prejudgment interest; and civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1] and the Insider Trading and Securities Fraud Enforcement Act of 1988. In addition, the Commission seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

5. The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

6. Venue lies in this Court pursuant to Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1, and 78aa]. O'Neill and Bray both reside and work in the District of Massachusetts, and the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the district.

## DEFENDANTS

7. **J. Patrick O'Neill**, age 64, is a resident of Belmont, Massachusetts. O'Neill was employed as a Senior Vice President and a Senior Credit Officer at Eastern Bank from early January 2010 to September 14, 2010, when he resigned his position rather than respond to a

routine regulatory request from the Financial Industry Regulatory Authority (FINRA) regarding trading activity in Wainwright prior to the public announcement.

8. **Robert H. Bray**, age 76, is a resident of Cambridge, Massachusetts. Bray is employed in the construction industry at R&B Construction Company ("R&B Construction"). Bray owned R&B Construction but purportedly sold the company in approximately 1999 to one of his employees. Bray continued to exert dominion and control over the company into at least 2011, however, including retaining control over the bank account and signing checks on behalf of the company.

## RELEVANT ENTITIES

9. **Eastern Bank** is a Boston, Massachusetts-based privately held mutual holding company. Eastern Bank conducts its banking operations through a wholly owned subsidiary bank trust company. On June 29, 2010, Eastern publicly announced that it had signed a definitive agreement to acquire Wainwright in an all-cash transaction valued at approximately $163 million. During the relevant period, Eastern had internal policies protecting its confidential information.

10. **Wainwright** was a Boston, Massachusetts-based bank incorporated in Massachusetts. Wainwright's securities were registered pursuant to Exchange Act Section 12(b) and its common stock traded on the NASDAQ under the symbol "WAIN."

## STATEMENT OF FACTS

### A. Eastern Bank's Confidentiality Agreement and Insider Trading Policies

11. O'Neill joined Eastern Bank in early 2010 as a Senior Vice President and a Senior Credit Officer. His job included evaluating the credit risk of potential corporate or loan portfolio acquisitions. As a new hire, O'Neill was required to read and acknowledge his obligations under

3

Eastern Bank's Code of Conduct, which included prohibitions against insider trading and the unauthorized release of confidential information such as business transactions.

12. Beginning on or about May 17, 2010, Eastern Bank entered into a confidential agreement with Wainwright for the sharing of information between the two companies to assist Eastern Bank with deciding whether to acquire Wainwright.

13. Because Eastern Bank planned for O'Neill to conduct a due diligence review of Wainwright's loan portfolios for Eastern Bank's use in assessing whether to acquire Wainwright, Eastern Bank instructed O'Neill to execute a confidentiality agreement concerning his work on the potential Wainwright acquisition. On May 20, 2010, O'Neill signed the confidentiality agreement, expressly stating:

> I hereby acknowledge that I have been advised by the Management of Eastern Bank Corporation ("Eastern") of a possible transaction involving Wainright [sic] Bank & Trust Company (the "Company"). That transaction could result in a possible acquisition of the Company by Eastern. In addition, it is likely that I will receive specific information about the Company during the due diligence conducted by Eastern. This information is confidential and non-public and constitutes "insider information" under applicable securities laws and regulations.

O'Neill acknowledged and agreed that, among other things, he would not disclose any material, non-public information about Wainwright "to family members, friends, or colleagues, where the information may be used by the other person to profit by trading," and he would not provide access to material non-public information except on a need-to-know basis.

14. Between approximately May 20, 2010 and the signing of the acquisition agreement between Eastern Bank and Wainwright on June 28, 2010, O'Neill conducted and completed a due diligence review of Wainwright's loan portfolios.

15. Through his due diligence work and his participation in meetings, O'Neill learned material, nonpublic information about Wainwright. For example, on Friday, June 11, 2010,

4

O'Neill participated in a meeting during which he and other Eastern Bank attendees were brought "up to speed" on the status of Eastern Bank's contemplated purchase of Wainwright.

### B. Bray and O'Neill's Personal Relationship

16. O'Neill and Bray were friends and had known each other for many years. Among other things, they were both golfers and members of the same local country club and they socialized at the country club's bar.

17. In April 2009, Bray's company (R&B Construction) hired O'Neill's college-freshman son to create a computer rendering of a townhouse that the construction company was seeking to build in Cambridge, Massachusetts. R&B Construction paid O'Neill's son $1,000 in cash for the drawing after the townhouse was built.

18. In June 2010, O'Neill's son listed Bray as an "Employer Reference" on an application for summer employment and identified himself as a "Drafter" for R&B Construction in the "Experience" section of his resume.

19. In October 2013, O'Neill was subpoenaed to testify in the Commission's investigation and during his testimony he asserted his Fifth Amendment privilege against self-incrimination as to each and every question asked of him, including, specifically:

> Q   Do you know a gentleman by the name of Robert Bray?
> A   On advice of counsel, I am exercising my Fifth Amendment privilege.
>
> Q   How long have you known Mr. Bray?
> A   On advice of counsel, I am exercising my Fifth Amendment privilege.
>
> Q   How often do you communicate with Mr. Bray?
> A   On advice of counsel, I am exercising my Fifth Amendment privilege.
>
> Q   When you began working at Eastern, did you let Mr. Bray know that you

        were hired by Eastern Bank?

A      On advice of counsel, I am exercising my Fifth Amendment privilege.

Q      Do you and Mr. Bray both belong to the . . . Country Club. . . ?

A      On advice of counsel, I am exercising my Fifth Amendment privilege.

Q      Do you play golf and socialize with Mr. Bray at [the] Country Club?

A      On advice of counsel, I am exercising my Fifth Amendment privilege.

20.    In September 2013, Bray was subpoenaed to testify in the Commission's investigation and during his testimony he asserted his Fifth Amendment privilege against self-incrimination as to each and every question asked of him, including, specifically:

Q.      Do you know an individual by the name of J. Patrick O'Neill?

A      Based on the advice of counsel, I assert my rights under the First Amendment, Fifth Amendment of the United States Constitution and respectively decline to answer the question.

Q      How long have you known Mr. O'Neill?

A      Based on the advice of counsel, I assert my rights under the Fifth Amendment of the United States Constitution and respectfully decline to answer the question.

Q      Were you aware that Mr. O'Neill was employed by Eastern Bank in the summer of 2010?

A      Based on the advice of counsel, I assert my rights under the Fifth Amendment of the United States Constitution and respectively decline to answer the question.

## C. Bray Purchased Wainwright Stock Based on O'Neill's Tip

21.    O'Neill conveyed to Bray material nonpublic information about Wainwright, Wainwright's securities, and/or Eastern Bank's contemplated purchase of Wainwright on one or more of the occasions that they were together at the country club between May 20, 2010 and

June 13, 2010, including on June 11 and 13, 2010, the days immediately before Bray began purchasing Wainwright stock.

22. At the time that O'Neill tipped Bray, Bray was aware that O'Neill worked in the banking industry.

23. On Monday, June 14, 2010, Bray sold shares of three other stocks in an E*TRADE brokerage account for total proceeds of $261,390.60. Bray used these funds to begin purchasing Wainwright shares, entering a Limit Order shortly after 11 a.m. to purchase 25,000 shares of Wainwright at $9.12 per share (a Limit Order is an order placed with a brokerage firm to buy or sell a set number of shares at or below a specified price).

24. At the time of Bray's June 14 order, Wainwright stock was quoted at $8.42 Bid (the maximum price at which a buyer is willing to purchase a security) and $9.81 Offer (the minimum price at which a seller is willing to sell a security). Bray did not receive any executions on his Limit Order on June 14, and he called an E*TRADE customer service representative to cancel the order.

25. Bray then spoke to another E*TRADE customer service representative shortly after 1:00 p.m. on June 14 to inquire on how to purchase Wainwright stock, stating:

> I'm trying to put an order in to buy some stocks and I can't do it through my electronic thing how I normally do because if I put the order in I know it's not going to fill. It's a, you know, they don't have that many shares. The market doesn't do that many shares. So I put an order in for 25,000 shares and I believe that's cancelled. . . . Now I want to buy that stock so how do I go about buying that stock? . . . I put an order in like for 25—that's kind of ridiculous because it doesn't trade that much, right?

26. At approximately 1:20 p.m. on June 14, Bray spoke to another E*TRADE customer service representative, stating:

> I put an order in this morning for 25,000 shares of the stock and I cancelled the order and now I'm trying to enter the order so I can buy it proportionately and I

7

need some advice on how to do it. I normally trade over the phone—punch the numbers—punch the letters—and then the trade gets executed. In this particular case, it seems the order was too large for that particular stock so I want to know how ... do I go about doing it. ... I placed an order for Wainwright Bank—WAIN—25,000 shares. And I had a representative on the phone and I asked her to cancel that. ... I know this kinda sounds crazy—how much of that stock can I buy right now? What's available at what price? Do you know that? ... If I want to buy--I can't put an order in for 25,000, that's crazy right? ... What would you recommend that I do to get a small order, or however many I can, how do I go about that?

27. E*TRADE customer service representatives informed Bray that the best mechanism to purchase a large amount of Wainwright stock was to place the order through E*TRADE's block trading desk (a team of traders that handle purchase or sell orders for a large number of shares of stock). Bray thereafter allowed the E*TRADE block trading desk to "work" his 25,000 share order over several days, resulting in multiple executions to fill all 25,000 shares in smaller increments and at varying prices, as follows: 4,624 shares on June 14, 2010 for $43,030.70; 5,282 shares on June 15, 2010 for $49,875.40; 4,292 shares on June 16, 2010 for $39,494.21; 1,693 shares on June 18, 2010 for $15,385.92; 2,369 shares on June 21, 2010 for $21,114.05; 4,840 shares on June 22, 2010 for $43,723.39; 562 shares on June 24, 2010 for $5,198.50; and 1,338 shares on June 25, 2010 for $12,922.26.

28. On June 22, 2010, Bray sold shares of thirteen other stocks for total proceeds of $294,048.99.

29. Between June 21, 2010 and June 28, 2010, Bray placed separate buy orders for Wainwright stock, resulting in his purchasing 6,000 additional shares, as follows: 1,000 shares on June 21, 2010 for $9,008.99; 2,000 shares on June 25, 2010 for $18,609.99; and 3,000 shares on June 28, 2010 for $29,694.99.

30. From June 14 to June 28, 2010, Bray accumulated a total of 31,000 shares of Wainwright stock at prices between $8.85 and $9.90 per share. Bray's purchases accounted for

approximately 56% of the total volume of Wainwright stock that traded during this time period. He spent $288,058.40 purchasing this stock in an E*TRADE brokerage account, which represented approximately 25% of his overall investment portfolio at that time. Bray did not purchase any other securities during this time period.

31.  Prior to his purchases of Wainwright stock in June 2010, Bray had never purchased Wainwright securities.

32.  On the morning of June 28, 2010, Bray entered an order to purchase 5,000 more shares of Wainwright at $9.25 per share. This order was not filled and, after the stock market closed for the day, Bray cancelled the order and replaced it with an order to purchase 5,000 shares of Wainwright at an increased limit of $10 per share. The revised order also was not filled once Eastern Bank publicly announced on June 29, 2010, prior to the opening of regular market trading, that it planned to acquire Wainwright's stock at a price of $19 per share in an all-cash transaction valued at approximately $163 million. The announcement caused Wainwright's stock price to increase by $9.06 per share, from $9.61 per share at the close of markets on June 28, 2010 to $18.67 per share at the close of markets on June 29, 2010 (an increase of approximately 94%).

33.  On September 3, 2010, Bray sold 2,000 shares of Wainwright at $18.72 per share for net proceeds of $37,429.57. On October 13, 2010, Bray sold a total of 4,000 shares at $18.85 or $18.86 per share for net proceeds of $75,390.72. Bray exchanged the remaining 25,000 shares for $19 per share pursuant to the terms of the acquisition for net proceeds of $474,980 on November 18, 2010. In total, Bray realized an actual profit of $299,741.89 from his trading in Wainwright stock.

### D. O'Neill Violated His Duty to Eastern Bank By Communicating Material Non-Public Information to Bray

34. Information about Wainwright and Eastern Bank's contemplated purchase of Wainwright that O'Neill obtained in the course of his employment and his due diligence work on the Wainwright acquisition was not publicly known or disseminated prior to the June 29, 2010 public announcement; rather Eastern Bank restricted the information to select persons and required them to keep the information confidential.

35. Information about Wainwright and Eastern Bank's contemplated purchase of Wainwright that O'Neill obtained in the course of his employment and his due diligence work was material. A reasonable investor would have viewed this information as being important to his or her investment decision or a significant alteration of the total mix of information made available to the public about Wainwright.

36. O'Neill knew, or recklessly disregarded, that the information about Wainwright and Eastern Bank's contemplated purchase of Wainwright that he obtained in the course of his employment and his due diligence work was both material and non-public.

37. O'Neill owed Eastern Bank: (i) a contractual duty and (ii) a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to keep the information about Wainwright and Eastern Bank's contemplated purchase of Wainwright that he obtained in the course of his employment and his due diligence work confidential, to abstain from purchasing or selling securities based on that information, and to abstain from tipping others outside of Eastern, including family and friends.

38. O'Neill knew, or recklessly disregarded, that he owed Eastern Bank a duty to keep information about Wainwright and Eastern Bank's contemplated purchase of Wainwright that he obtained in the course of his employment and his due diligence work confidential.

39. O'Neill willfully or recklessly violated both his contractual and fiduciary duty he owed to Eastern Bank by tipping to Bray, in words or in substance, material nonpublic information about Wainwright, Wainwright's securities, and/or Eastern Bank's contemplated purchase of Wainwright.

40. O'Neill tipped Bray with the expectation of receiving a benefit, and he in fact benefitted, including by currying favor with Bray and/or providing confidential information to a trading friend.

41. In October 2013, O'Neill was subpoenaed to testify in the Commission's investigation and during his testimony he asserted his Fifth Amendment privilege against self-incrimination as to each and every question asked of him, including, specifically:

> Q  And isn't it true that at some point prior to June 14th, in breach of the duties of trust and confidence you owed your employer, you communicated information pertaining to this proposed [Wainwright acquisition] to Robert H. Bray?
>
> A  On advice of counsel, I am exercising my Fifth Amendment privilege
>
> Q  And isn't it true that you tipped Robert H. Bray in order to receive a personal reputational benefit of bestowing valuable material nonpublic information to a person whose trading upon it was foreseeable?
>
> A  On advice of counsel, I am exercising my Fifth Amendment privilege.

42. At the time Bray purchased the Wainwright securities, as alleged above, he was in possession of material, non-public information about Wainwright, Wainwright's securities, and/or Eastern Bank's contemplated purchase of Wainwright.

43. Bray purchased the Wainwright shares on the basis of the material, non-public information about Wainwright, Wainwright's securities, and/or Eastern Bank's contemplated purchase of Wainwright that he received from O'Neill.

44. At the time of his purchase, Bray knew of O'Neill's employment in the banking industry. Bray knew, recklessly disregarded, or should have known that the information he received from O'Neill about Wainwright, Wainwright's securities, and/or Eastern Bank's contemplated purchase of Wainwright was: (i) material and nonpublic; and (ii) was disclosed or misappropriated in breach of a contractual or fiduciary duty, or similar relationship of trust and confidence.

### E. O'Neill Abruptly Resigned From Eastern Bank Rather than Participate in a FINRA Inquiry

45. FINRA is a stock brokerage industry self-regulatory organization that, among other things, routinely conducts inquiries of suspicious trading activity in stocks prior to merger announcements.

46. On August 23, 2010, FINRA sent to Eastern Bank a letter concerning the trading activity in Wainwright prior to the June 29, 2010 public announcement, along with an attached list of names of more than 30 individuals who purchased Wainwright securities prior to the June 29 announcement. The FINRA letter asked Eastern Bank to circulate the list of names to all employees who participated in or were privy to events leading up to the Wainwright acquisition announcement, and requested that the Eastern Bank employees identify anyone they knew on the list and provide a detailed description of any past or present relationship with that person. Bray's name was on the list.

47. On August 25, 2010, an attorney in Eastern Bank's legal department circulated by email the FINRA letter and list of names to various employees, including O'Neill. The attorney's transmittal email stated that FINRA has:

> forwarded a list of the names of individuals and companies and have asked that we circulate these names to our officers and directors to determine if any Eastern personnel know of these individuals and companies. If any of these are known by Eastern personnel, FINRA has requested that we advise them of that fact as well

as the nature of the relationship and whether there has been any communications among the parties during a certain period of time. THE REQUEST IS ROUTINE AND THE FACT THAT ANY OF THESE INDIVIDUALS OR COMPANIES ARE KNOWN BY EASTERN PERSONNEL IS NOT AN ISSUE OF CONCERN unless, of course, non-public information about Wainwright has been conveyed during the period in question. Since each of you were involved in the due diligence, I am requesting that you review the list of individuals and companies on the attached document (WAIN ID List.pdf) and advise me if you know any of them . . . We have a very short time frame within which to respond. I will need responses from each of you by close of business on September 2.

48. On August 31, 2010, the Eastern Bank attorney again emailed O'Neill, reminding him that she needed a response to the FINRA list of names "before the end of day, Thursday, September 2." O'Neill, however, did not respond to either the attorney's August 25 or August 31 email instructions to identify any people that he knew on the FINRA list.

49. On September 2, 2010, at approximately 11 a.m., O'Neill's immediate supervisor left O'Neill voicemail messages on both his office and cellular telephone lines. At 12:41 p.m., O'Neill's supervisor also sent an email to O'Neill forwarding the Eastern Bank attorney's August 25 instruction to respond to the FINRA list. In this email, O'Neill's supervisor stated: "Pat[,] Very important that we close this out today. I am told that you have received and not replied to 2 emails on this. A 'non response' as indicated below, cannot happen."

50. O'Neill was out of the office on vacation from September 2, 2010 through September 7, 2010. During this time, O'Neill did not reply to Eastern Bank's requests to respond to the FINRA list of names.

51. On the morning of September 8, 2010, O'Neill called his supervisor and left a voicemail message stating that he was ill with pneumonia and would be out all week. At 9:35 a.m., O'Neill emailed his supervisor, stating, "I have a bad case of pneumonia and was told to stay home for the week, as it is bacterial and contagious." At 10:08 a.m., O'Neill's supervisor emailed O'Neill, asking O'Neill if he could call to discuss the FINRA inquiry. O'Neill called his

supervisor later that day and, during this conversation, stated that he was ill and on medicine, that he was aware of Eastern Bank's request that he respond to the FINRA inquiry, but that he was unable to respond for "personal reasons."

52. Eastern Bank agreed to extend the deadline for O'Neill to provide a response to the FINRA request until September 13, 2010, upon O'Neill's anticipated returning to work.

53. O'Neill met with his supervisor in person on September 13, 2010 at approximately 8 a.m. O'Neill's supervisor instructed O'Neill that if he did not respond to the FINRA letter by the end of the day, Eastern Bank would seek employment-related discipline, including termination. O'Neill said that he needed to speak to his wife, and he left the office at approximately 9:30 a.m. At approximately 3 p.m. that day, O'Neill again spoke to his supervisor and requested an additional day to "consider" Eastern Bank's instruction that he provide the required information as he was still recovering from his illness and considering his response. Eastern Bank agreed to extend the time for a response until 5:00 p.m. the next day.

54. On September 14, 2010 at 10:57 a.m., O'Neill emailed his supervisor stating without explanation that he was resigning from Eastern Bank "effective immediately." O'Neill's resignation email instructed Eastern Bank to direct any future communications regarding O'Neill's employment to his personal attorney, who was also copied on the email.

### F. O'Neill Transferred His House to His Wife's Name

55. Prior to September 13, 2010, O'Neill and his wife owned their house as tenants by the entirety.

56. On September 13, 2010, the day O'Neill met with his supervisor--and the day before he resigned from Eastern Bank--O'Neill and his wife executed a deed transferring title in the house to O'Neill's wife alone.

## **CLAIM FOR RELIEF**

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder
### (Against Defendants O'Neill and Bray)

57. The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 56 above.

58. The information about Wainwright, Wainwright's securities, and/or Eastern Bank's contemplated purchase of Wainwright that O'Neill conveyed to Bray was material and nonpublic. In addition, the information was considered confidential by Eastern Bank, the company that was the source of the information, and Eastern Bank had policies and procedures protecting confidential information.

59. O'Neill: (i) knew, or recklessly disregarded that, the information about Wainwright, Wainwright's securities, and/or Eastern Bank's contemplated purchase of Wainwright that he conveyed to Bray was material and nonpublic; (ii) knew, or recklessly disregarded that, he had a contractual or fiduciary duty, or obligation arising from a similar relationship of trust and confidence, that he owed to Eastern Bank to keep this information confidential, to abstain from purchasing or selling securities based on this information, and to abstain from tipping others outside of Eastern, including family and friends; and (iii) knowingly or recklessly breached his duty with the expectation of receiving a benefit, and he in fact benefitted, including by currying favor with Bray and/or providing confidential information to a trading friend.

60. Bray knew, recklessly disregarded, or should have known, that O'Neill owed a contractual or fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to keep the information about Wainwright, Wainwright's securities, and/or Eastern Bank's contemplated purchase of Wainwright confidential.

61. Bray knew, recklessly disregarded, or should have known, that the material nonpublic information he received from O'Neill about Wainwright, Wainwright's securities, and/or Eastern Bank's contemplated purchase of Wainwright was disclosed or misappropriated in breach of a contractual or fiduciary duty, or obligation arising from a similar relationship of trust and confidence.

62. Bray purchased Wainwright shares on the basis of the material nonpublic information that he received from O'Neill regarding Wainwright, Wainwright's securities, and/or Eastern Bank's contemplated purchase of Wainwright.

63. By virtue of the foregoing, defendants O'Neill and Bray, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

64. By virtue of the foregoing, O'Neill and Bray, directly or indirectly, violated and, unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

A. Permanently restraining and enjoining O'Neill and Bray from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

B. Ordering O'Neill and Bray to disgorge, on a joint and several basis, with pre-judgment interest, all ill-gotten gains received as a result of the conduct alleged in this complaint, including all illicit trading profits;

C. Ordering O'Neill and Bray to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

D. Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its attorneys,

/s/ David H. London

David H. London (BBO# 638289)
J. Lauchlan Wash (BBO# 629092)
33 Arch Street, 23rd Floor
Boston, MA 02110
(617) 573-8997 (London)
(617) 573-4590 (Facsimile)
LondonD@sec.gov
WashJ@sec.gov

Dated: August 18, 2014